Walt **SHINAULT**, Plaintiff–Appellant,

v.

**AMERICAN AIRLINES, INC.,**
Defendant–Appellee.

No. 90–1495.

United States Court of Appeals,
Fifth Circuit.

July 25, 1991.

*form* to Medicare methods or levels of reimbursement." 42 CFR § 447.205(b) (emphasis added).

Jeffrey P. Hubbard, Wells, Moore, Simmons, Stubblefield & Neeld, Jackson, Miss., for plaintiff-appellant.

Daniel F. Goldstein, Andrew D. Freeman, Brown, Goldstein & Levy, Baltimore, Md., for amicus curiae National Federation of the Blind.

Timothy Cook, National Disability Action Center, Douglas L. Parker, Institute for Public Representation, Washington, D.C., for amicus curiae Paralyzed Veterans of America, et al.

David A. Barfield, S. Craig Panter, Kirkland, Barfield & Panter, Jackson, Miss., for defendant-appellee.

Before CLARK, Chief Judge, WILLIAMS, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Walt Shinault appeals the district court's decision granting summary judgment and rejecting his claim under the Air Carrier Access Act. We affirm in part, reverse in part, and remand.

I.

Shinault is a thirty-year-old quadriplegic from Jackson, Mississippi. As the 1989 National Easter Seals Adult Representative, Shinault traveled frequently to promote disability awareness and to raise money for Easter Seals. On February 15, 1989, Shinault traveled to Washington, D.C. to meet with President Bush. Shinault flew from Jackson to Washington, D.C. with Jeff Covington. After meeting with President Bush, Shinault and Covington were scheduled to return to Jackson on American Airlines (American). Their itinerary was as follows:

| Flight 605 | Departure | Washington, D.C. | 1:08 p.m. |
| | Arrival | Nashville, TN | 2:00 p.m. |
| Flight 1019 | Departure | Nashville, TN | 2:42 p.m. |
| | Arrival | Jackson, MS | 3:52 p.m. |

Due to mechanical problems, Flight 605 did not depart from Washington, D.C. until 1:40 p.m., and bad weather caused even more delays. As a result, Flight 605 arrived in Nashville at 2:45 p.m., 45 minutes behind schedule and three minutes after Shinault's connecting flight to Jackson originally had been scheduled to depart. That connecting flight, however, was also delayed by bad weather. A flight attendant told Shinault that he would make his connecting flight and that other passengers on Flight 605 had to make the same connection. Shinault was particularly anxious to make the connection because he had scheduled a press conference at the Jackson Airport.

When Flight 605 arrived in Nashville, Shinault asked permission to deplane immediately. A flight attendant told Shinault that other passengers had to deplane first. All passengers transferring to Flight 1019, except Shinault, were allowed to leave the plane first. The remaining passengers followed. After all other passengers had deplaned, an American special services agent brought a gurney onto the plane and transferred Shinault from his seat to the gurney. The agent wheeled Shinault off the plane to a manual wheelchair. Shinault asked that he be allowed to remain on the gurney until he reached his connecting flight. He was informed that his request was against American's policy. Shinault was transferred to the wheelchair and taken to the departing gate for Flight 1019.

American gate agent Anita Appleton was working the jetbridge for Flight 1019. Before closing the door to Flight 1019 for the first time, Appleton boarded some late pas-

sengers. She then closed the door and pulled the jetbridge away from the airplane. The zoner called Appleton and told her that she had more passengers to board. Because it was nearing departure time, she had to contact the planner to get authority to extend the jetbridge back to the aircraft. After she boarded the additional passengers, Appleton again pulled back the jetbridge. Shortly before departure, a member of the ground crew approached Appleton with paperwork for the captain of Flight 1019. The paperwork involved Shinault's wheelchair. Appleton again obtained permission to extend the jetbridge, and after delivering the paperwork, she closed the door and pulled back the jetbridge.

Shinault testified in his deposition that he and Covington arrived at the gate at 2:50 p.m. Covington asked American Airlines agent Ken Barry if he and Shinault could board Flight 1019. Barry told them that they had arrived too late and had missed their flight. The plane was still at the gate, the door from the concourse to the jetbridge was open, and the light inside the jetbridge was on. Covington pointed out to Barry that the plane was still on the tarmac. Barry started typing on the computer. Shortly thereafter, Appleton emerged from the jetbridge, turned out the light inside the jetbridge, and closed the door. Barry asked Appleton if Flight 1019 had left already. Shinault testified in his deposition that Appleton said no, but Covington testified in his deposition that Appleton told Barry that she had just closed the door. Barry and Appleton walked down the jetbridge. When Barry returned, he told Shinault and Covington that he was sorry they missed their connection and that he would determine when the next flight to Jackson was available. No one boarded Flight 1019 after the time Shinault and Covington arrived at the gate. According to American's records, Flight 1019 pulled away from the gate at 3:00.

Realizing that he had to wait for the next flight to Jackson, Shinault asked for his wheelchair, but the chair had already been placed in the baggage compartment of Flight 1019. Shinault chose not to take the next flight to Jackson because it had a connecting flight in Dallas. Shinault waited for five hours in the lowback manual wheelchair before catching the next direct flight to Jackson. The manual wheelchair had neither seat belts nor other restraining devices, and Shinault feared that he would lose his balance and fall out of the wheelchair. Shinault also feared that the manual wheelchair would cause pressure sores. Finally, Shinault had delayed performing his bowel program, and he feared that the delay would induce dysreflexia or a stroke or that he would have a sudden bowel movement. None of Shinault's fears were realized.

After complaining to American's executive office without results, Shinault sued American under the Air Carrier Access Act of 1986 (ACAA), 49 U.S.C.App. § 1374(c), alleging that American discriminated against him by refusing to let him board Flight 1019 because he was handicapped. Shinault sought injunctive relief, compensatory damages, emotional distress damages, and punitive damages. The district court granted American's motion for summary judgment on the following grounds: (1) the ACAA does not allow for recovery of emotional distress damages; (2) the ACAA is a remedial statute and does not allow for recovery of punitive damages; and (3) the district court cannot issue injunctive relief because under the doctrine of primary jurisdiction, the Secretary of Transportation is charged with enforcing the ACAA. 738 F.Supp. 193. The district court did not address explicitly Shinault's claim for compensatory damages. Shinault appeals.

## II.

We review the grant of a summary judgment motion de novo, using the same criteria used by the district court in the first instance. *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1325 (5th Cir.1991). We review the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party. *Id.* at 1325–26. If no genuine issue as to any material fact exist and the moving

party is entitled to judgment as a matter of law, the district court will grant summary judgment. Fed.R.Civ.P. 56(c).

## III.

Under the ACAA, "No air carrier may discriminate against any otherwise qualified handicapped individual, by reason of such handicap, in the provision of air transportation." 49 U.S.C.App. § 1374(c)(1). The ACAA does not provide for a private cause of action. We may imply private remedies, however, after considering the following four factors: (1) whether the plaintiff is one of the class of persons whom the statute was intended to benefit; (2) whether the legislature intended to create a private remedy; (3) whether a private remedy is consistent with the underlying statutory scheme; and (4) whether the contemplated remedy traditionally has been relegated to state law. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975). No one disputes that Shinault is an "otherwise qualified handicapped individual" under the statute. The legislative history of the ACAA indicates that Congress intended to provide a private cause of action under the ACAA and that cause of action would be consistent with the statutory scheme. *See Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 569–70 (8th Cir.1989). Private remedies for discrimination by airlines have traditionally emanated from federal legislation. *See* § 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b), *repealed by* Airline Deregulation Act of 1978, 49 U.S.C.App. § 1551(a)(2)(B). We conclude, therefore, that a private cause of action exists under the ACAA.

## IV.

American argues that Shinault presented no evidence from which a reasonable juror could conclude that Shinault had been the victim of discrimination. The district court did not decide whether Shinault created a genuine issue of material fact on this point, but American proposes the absence of any evidence of discrimination as an alternative ground for affirming the summary judgment. *Meza v. General Battery Corp.*, 908 F.2d 1262, 1274 (5th Cir.1990); *Guidry v. Broussard*, 897 F.2d 181, 182 n. 1 (5th Cir.1990) (per curiam). To survive a motion for summary judgment on the liability issue, Shinault "must make a showing sufficient to establish the existence of" discrimination. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In his complaint, Shinault alleged that American intentionally discriminated against him by refusing to allow him to board Flight 1019 because of the extra time required by a wheelchair passenger. According to Shinault, American did not want to further delay a flight that was already running behind schedule. In support of his claim, Shinault, in his answers to American's interrogatories, asserts that he was told that Flight 1019 had already departed even though he "could plainly see that the airplane had not yet left the gate and that the door to the jetway was still open." American concedes in its Itemization of Undisputed Facts that other passengers from Flight 605 made their connection with Flight 1019, and that Shinault did not. American also concedes that Appleton twice extended the jetbridge after closing the door to the aircraft, once to board additional late passengers and once to deliver paperwork to the captain. In his deposition testimony, Shinault contends that Appleton responded in the negative when asked by Barry whether Flight 1019 had left already. Finally Shinault testified in his deposition that he arrived at the departure gate at 2:50 p.m. (according to Covington's watch), and American admits that the plane did not pull away from the gate until 3:00 p.m. (according to automatic clocks on the plane). All of these facts, interpreted in the light most favorable to Shinault, raise a genuine issue as to discrimination by American. A jury could conclude that, but for Shinault's handicap and the additional time required to get him aboard the airplane, American would have allowed him to board Flight 1019. We decline, therefore, to affirm the district court's summary judgment on alternative grounds.

## V.

 The touchstone for deciding whether a statute provides a particular remedy is congressional intent. Congress often manifests its intent to provide certain remedies through the express language of the statute. When a statute expressly provides for a particular remedy or remedies, courts should be very reluctant to imply additional remedies. *Northwest Airlines v. Transport Workers Union*, 451 U.S. 77, 93–94, 101 S.Ct. 1571, 1581–82, 67 L.Ed.2d 750 (1981) (interpreting the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964); *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (interpreting The Rail Passenger Service Act of 1970). When a statute contains no remedial provision or when the remedial provision is unclear, courts must seek congressional intent from the language of the statute as a whole, legislative history of the statute, and the congressional purposes underlying the statute. *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220–21, 106 S.Ct. 2485, 2493–94, 91 L.Ed.2d 174 (1986) (interpreting § 7 of the Death on the High Seas Act). The ACAA has no language indicating what remedies are available under it. In determining which remedies Congress intended to provide in the ACAA, therefore, we turn to the legislative history of the ACAA and the congressional purposes underlying the statute. We examine first Congress' earlier efforts to prohibit discrimination by airlines.

Congress adopted § 404 of the Federal Aviation Act of 1958 to address discrimination against handicapped people by the airline industry. Section 404 contained two separate antidiscrimination provisions: (1) under § 404(a)(1), all air carriers were required to "provide safe and adequate service, equipment, and facilities"; and (2) under § 404(b), air carriers were prohibited from "subject[ing] any particular person ... to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." The Civil Aeronautics Board (CAB)—whose regulatory functions later were transferred to the Department of Transportation under the Civil Aeronautics Board Sunset Act of 1984, 49 U.S.C.App. §§ 1553–1557—used § 404(a)(1) as a basis for prohibiting discrimination against handicapped individuals by commercial airlines. 14 C.F.R. Pt. 382, Subpart A (1990). Courts used § 404(b) as a basis for implying private causes of action by handicapped individuals against commercial airlines. *Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408, 1411–12 (9th Cir.1984); *Nader v. Allegheny Airlines*, 512 F.2d 527, 537 (D.C.Cir.1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct.1978, 48 L.Ed.2d 643 (1976).

Congress later extended its protection of handicapped people through § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) which provides:

> No otherwise qualified individual with handicaps in the United States, as defined in Section 706(8) of this Title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. . . .

The CAB used § 504 to regulate only airlines that received federal subsidies under § 406(b) or § 419 of the Federal Aviation Act.[1] The § 504 regulations included the same general antidiscrimination provisions that were applied to commercial airlines through § 404(a)(1). 14 C.F.R. Pt. 382, Subpart A (1990). Under § 504, however, the CAB also promulgated much more detailed and extensive antidiscrimination regulations. 14 C.F.R. Pt. 382, Subparts B and C (1990). Three organizations representing handicapped people challenged the CAB's interpretation of § 504 in *United States Dep't of Transp. v. Paralyzed Veterans of America (DOT v. PVA )*,

---

1. Two types of airlines received federal subsidies under these provisions: (1) airlines transporting mail to small communities received subsidies under § 406 of the Federal Aviation Act, 49 U.S.C.App. § 1376(b) (1982); and (2) airlines providing passenger service to small communities received subsidies under § 419 of the Federal Aviation Act, 49 U.S.C.App. § 1389 (1982).

477 U.S. 597, 604–06, 106 S.Ct. 2705, 2710–11, 91 L.Ed.2d 494 (1986). In that case, the plaintiffs argued that the CAB had underestimated the scope of its regulatory authority under § 504 because all airlines receive federal financial assistance—albeit indirectly—through airport development programs and through the air traffic control system. The Supreme Court rejected this argument, holding that § 504 does not apply to commercial airlines.

*DOT v. PVA* revealed the limited protection available to handicapped people against discrimination by commercial airlines. The government exerted only minimal regulatory authority over commercial airlines under § 404(a)(1)'s "safe and adequate service" clause. And after § 404(b) was repealed by the Airline Deregulation Act of 1978, handicapped people were left without a private remedy against discrimination by commercial airlines.

■ Congress passed the ACAA in 1986, hoping to prevent the "humiliating and degrading" practices of airlines. 132 Cong. Rec. S11,787 (daily ed. Aug. 15, 1986) (statement of Sen. Metzenbaum); *See also* 132 Cong.Rec. H7194 (daily ed. Sept. 18, 1986) (statements of Rep. Edgar and Rep. Ackerman). The legislative history of the ACAA indicates that Congress was responding to *DOT v. PVA. See* 132 Cong. Rec. S11,784 (daily ed. Aug. 15, 1986) (statement of Sen. Dole); S.Rep. No. 400, 99th Cong., 2d Sess. 1, *reprinted in* 1986 Cong.Code & Admin.News 2328, 2329; 132 Cong.Rec. H7057 (daily ed. Sept. 17, 1986) (statement of Rep. Sundquist); 132 Cong. Rec. H7193 (daily ed. Sept. 18, 1986) (statements of Reps. Mineta, Hammerschmidt, Ackerman, Edgar, and Snyder). American suggests that because Congress passed the ACAA in response to *DOT v. PVA,* we should view the ACAA as an *extension* of § 504. Under this view, the private remedies available under the ACAA would be the same as private remedies available un-

der § 504. We find this reasoning unpersuasive.

First, *DOT v. PVA* did not discuss private remedies under § 504. That case dealt with the scope of CAB's regulatory authority over commercial airlines. The fact that Congress passed the ACAA in response to *DOT v. PVA,* therefore, does not imply that Congress intended the ACAA and § 504 to provide the same private remedies. All that we can infer from the link between the ACAA and *DOT v. PVA* is that Congress wanted to extend federal authority over commercial airlines to allow detailed regulations like those that had been applied already to subsidized airlines through § 504.

Second, nothing in the legislative history of the ACAA suggests that Congress wanted § 504's remedial scheme to apply to private claims under the ACAA. Congress made the substantive antidiscrimination requirements of the ACAA comparable to § 504: Senator Dole noted that the ACAA "incorporates compromise definitions which rely heavily on language and precedents from the Rehabilitation Act." 132 Cong. Rec. S11,784–85 (daily ed. Aug. 15, 1986). But nothing in the legislative history of the ACAA implies that the remedies available for a breach of those substantive antidiscrimination requirements must be the same under the two statutes.

Third, Congress could not have made the remedial scheme under the ACAA equivalent to the remedial scheme under § 504 even if it had wanted to. Section 504 was patterned after § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[2] and § 504 uses the same "remedies, procedures, and rights set forth in Title VI." 29 U.S.C. § 794a(a)(2). Under Title VI, one of the main remedies is withdrawal of federal funds. 42 U.S.C. § 2000d–1. The ACAA was intended to cover airlines that do not receive federal funds. Under no circumstances, therefore,

---

**2.** Title VI provides in relevant part:
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

could the remedial schemes of the ACAA and § 504 be equivalent.

Fourth, the ACAA and § 504 are inherently different because § 504 was passed under Congress' Spending Clause power and the ACAA was not. The Supreme Court has noted that "make whole" remedies are ordinarily not available under Spending Clause statutes. In *Guardians Ass'n v. Civil Service Comm'n of New York*, 463 U.S. 582, 596, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983), *citing Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 15, 101 S.Ct. 1531, 1538–39, 67 L.Ed.2d 694 (1981), Justice White made the following observation about Spending Clause legislation:

> Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's plan, proposal, or program will satisfy the conditions of the grant or other extension of federal funds, and the grantee will have in mind what its obligations will be. When in a later private suit brought by those for whose benefit the federal money was intended to be used it is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipt of federal money than assume the unanticipated burdens.

At least one district court has cited Spending Clause concerns to limit damage remedies under § 504. *See Ruth Anne M. v. Alvin Indep. School Dist.*, 532 F.Supp. 460, 473 (S.D.Tex.1982). Another district court refused to award damages under § 504 because of the added burden on federal funds that were intended to reach the beneficiaries through the funded program rather than through litigation. *See Rhodes v. Charter Hosp.*, 730 F.Supp. 1383, 1385–86 (S.D.Miss.1989). These rationales for limiting damages are not applicable to the ACAA.

■ Finally, Congress would have had little reason to link the remedies available under the ACAA to remedies available under § 504 because the private remedial scheme under § 504 is so uncertain. It is settled law that § 504 permits injunctive and declaratory relief, *Guardians Ass'n v. Civil Service Comm'n of New. York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), as well as monetary awards in the form of backpay. *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 631, 104 S.Ct. 1248, 1252–53, 79 L.Ed.2d 568 (1984). But the courts are badly divided on the issue of compensatory damages. *E.g., Greater Los Angeles Council on Deafness v. Zolin*, 812 F.2d 1103, 1107 (9th Cir.1987) (damages allowed); *Miener v. Missouri*, 673 F.2d 969, 977–79 (8th Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982) (damages allowed); *Marshburn v. Postmaster General of the United States*, 678 F.Supp. 1182, 1184 (D.Md.1988) (no damages allowed); *Ruth Anne M. v. Alvin Indep. School Dist.*, 532 F.Supp. 460, 473 (S.D. Tex.1982) (no damages allowed).

For all of these reasons, we conclude that the ACAA is not merely an extension of § 504. Shinault urges us to compare the ACAA to other federal antidiscrimination statutes, namely, 42 U.S.C. § 1982, 42 U.S.C. § 1983, and the Fair Housing Act (42 U.S.C. § 3601, *et seq.*). This is the approach used in *Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 570 (8th Cir. 1989), the only other circuit court case addressing the issue of private remedies under the ACAA.[3] In *Tallarico* the Eighth Circuit allowed emotional distress damages after concluding that the ACAA is more closely analogous to federal antidiscrimination statutes that allow emotional dis-

**3.** Besides the district court in this case and the district court in *Tallarico*, one district court has addressed private remedies under the ACAA. In *Americans Disabled for Accessible Public Transportation v. Skywest Airlines*, 762 F.Supp. 320 (D.Utah 1991), the court followed the reasoning of the district court in this case, holding that the ACAA and the Rehabilitation Act have the same remedies. The court dismissed the plaintiffs' claims for emotional distress damages and punitive damages and denied injunctive relief as "duplicitous and unnecessary" in light of the fact that the Department of Transportation has recently issued regulations implementing the ACAA.

tress damages than to federal antidiscrimination statutes that do not allow emotional distress damages. We find attempts to "match" federal antidiscrimination statutes both complex and unilluminating. Although we ultimately agree with the result reached by the Eighth Circuit, we travel there on a different road.

We have found no significant evidence in the legislative history and in the circumstances surrounding the passage of the ACAA to indicate what types of remedies Congress intended to provide for private litigants. In this circumstance, we fall back on a well-established canon of statutory construction: "The existence of a statutory right implies the existence of all necessary and appropriate remedies." *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969). In *Guardians*, Justice White referred to this canon as the "usual rule," and noted that it is subject to only two exceptions: (1) the rule "yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved"; and (2) " 'make whole' remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress" under the Spending Clause. 463 U.S. at 595, 596, 103 S.Ct. at 3228–29, 3229. As discussed above, we have found no congressional intent to deny or limit private remedies under the ACAA and the ACAA was not passed pursuant to Congress' Spending Clause power.

This canon of statutory construction has a long history. The Supreme Court declared in 1867:

> The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.

*Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867).

■ In 1946 the Court asserted that "it is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). The Supreme Court has taught us to look for an "explicit congressional declaration that persons injured [in violation of federal law] may not recover money damages." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971); *see also Davis v. Passman*, 442 U.S. 228, 246–47, 99 S.Ct. 2264, 2277–78, 60 L.Ed.2d 846 (1979). Because Congress did not limit the available remedies under the ACAA, we conclude that Congress intended to allow private plaintiffs to recover all necessary and appropriate remedies.

■ Shinault requests four types of remedies: (1) injunctive relief; (2) compensatory damages; (3) emotional distress damages; and (4) punitive damages. For reasons stated in the following paragraphs, we conclude that injunctive relief from a court is ordinarily not necessary under the ACAA because the Department of Transportation secures prospective relief through administrative remedies. We conclude that compensatory damages and emotional distress damages are necessary and appropriate under the ACAA. Finally, we need not decide whether punitive damages are recoverable because Shinault does not allege the type of wanton or malicious conduct that is required to recover punitive damages.

■ The district court denied injunctive relief under the doctrine of primary jurisdiction. This Court has described the doctrine of primary jurisdiction:

> When legal disputes develop that directly affect an industry subject to regulation, the need arises to integrate the regulatory agency into the judicial decision making process. One method to accomplish integration is to have an agency pass in the first instance on those issues that are within its competence. In short, the agency should have the first word.

*Mississippi Power & Light Co. v. United Gas Pipe Line*, 532 F.2d 412, 417 (5th Cir.1976).

Although "courts should be reluctant to invoke the doctrine of primary jurisdiction," *id.* at 419, we conclude that Shinault's claim for injunctive relief under the ACAA presents a particularly sympathetic case for deference to the agency. Shinault is unlikely to encounter again the same set of circumstances that faced him on February 17, 1989. He has, therefore, less personal interest in this aspect of his claim than in the damage remedies. And the Department of Transportation has promulgated regulations to address the problems complained of by Shinault. 14 C.F.R. Pt. 382 (1991), 55 Fed.Reg. 8008 (March 6, 1990). Facing a similar situation in adjudicating private causes of action under § 404(b) of the Federal Aviation Act, courts typically refused to grant injunctions: "An injunction against prospective or continuing discrimination is usually refused out of deference to the administrative remedies before the Civil Aeronautics Board." *Archibald v. Pan Am. World Airway, Inc.*, 460 F.2d 14, 16 (9th Cir.1972), *citing Mortimer v. Delta Air Lines*, 302 F.Supp. 276, 282 (N.D.Ill.1969), and *Wills v. Trans World Airlines*, 200 F.Supp. 360, 366 (S.D. Cal.1961). Our unwillingness to hear Shinault's claim for injunctive relief should not be interpreted as a blanket proscription on judicially issued injunctions under the ACAA. We merely hold that the Department of Transportation should ordinarily have the first opportunity to hear claims requiring prospective relief.

The district court denied compensatory damages and emotional distress damages, holding that the ACAA does not allow damage remedies. Our analysis of the ACAA indicates otherwise. In *Bivens*, the Supreme Court held that a plaintiff should receive "money damages for any injuries ... suffered." 403 U.S. at 397, 91 S.Ct. at 2005. The Supreme Court followed this reasoning in *Davis*, holding, "if petitioner is able to prevail on the merits, she should be able to redress her injury in damages." 442 U.S. at 248, 99 S.Ct. at 2278–79. Although these cases involved invasions of constitutional rights, the same reasoning

consistently has been applied to invasions of statutory rights. *E.g., J.I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Burr by Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir. 1988); *Miener v. Missouri*, 673 F.2d 969, 977–78 (8th Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982). We conclude, therefore, that the ACAA allows recovery of compensatory damages, including damages for emotional distress.

The district court denied punitive damages after concluding that the ACAA had the same remedial scheme as § 504 of the Rehabilitation Act and that punitive damages were not recoverable under that Act. We disagree with the district court's reasoning on this point, having concluded that the remedial scheme under the ACAA does not track the remedial scheme under § 504. But we decline the invitation to decide whether punitive damages are available under the ACAA because Shinault does not allege the type of wanton and malicious conduct necessary to recover punitive damages.

For all of the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART the district court's judgment and REMAND for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.