103 F.3d 137
 9 NDLR P 81
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Larry ADIUTORI, Plaintiff-Appellant,
v.
SKY HARBOR INTERNATIONAL AIRPORT, Owned and operated by the
City of Phoenix, City of Phoenix, U.S. Air, Inc., a Delaware
corporation; America West Airlines, a Delaware corporation;
Ogden Aviation Services, International, a New York
Corporation, Defendants-Appellees.
 No. 95-15774.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 16, 1996.
Decided Nov. 20, 1996.
 
 1
 Before: WIGGINS and TROTT, Circuit Judges, and VANCE, District Judge*.
 
 
 2
 MEMORANDUM**
 
 
 3
 This is an appeal from an order of the district court granting summary judgment against appellant on all of his federal and state law claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 FACTS
 
 4
 Appellant Larry Adiutori ("Mr. Adiutori") filed this claim for damages arising out of a heart attack he suffered on February 18, 1993 on a USAir flight en route to Pittsburgh, Pennsylvania from Phoenix, Arizona. Appellant contends that his heart attack resulted from appellees' failure to provide him with proper assistance in going from the America West terminal in Sky Harbor International Airport ("Sky Harbor") in Phoenix, Arizona, to the USAir terminal 1 1/2 miles away. As of February 18, 1993, appellant was seventy-three years old, 5'3"' tall, weighed over 300 pounds, and suffered from severe arthritis in both knees, which left him with the ability to walk short distances only with the assistance of two canes.
 
 
 5
 In January 1993, appellant and his wife flew on a USAir flight from Pittsburgh to Tucson with a touchdown in Phoenix to visit their daughter, Rebecca Magnotto ("Mrs. Magnotto"). (Excerpts of Record of Appellant, Larry Adiutori ("ER"), Ex. 4 at p 11). In February 1993, the Adiutoris began making arrangements to return to their home in Pittsburgh. To this end, their daughter made a reservation with and purchased a ticket from USAir for a direct flight leaving February 18, 1993 from Tucson to Pittsburgh with a touchdown in Phoenix. (Id. at p 15). Mrs. Magnotto testified that she specifically requested that a wheelchair be waiting for Mr. Adiutori upon his arrival at the Pittsburgh airport to take him to the boarding gate, and she asked the travel agent to make sure that Mr. Adiutori's ticket identified him as wheelchair dependent. (Id. at p 11).
 
 
 6
 Because USAir had to cancel the Tucson-to-Phoenix portion of the return flight, it arranged for the Adiutoris to take an America West flight to Phoenix, where they were to switch to their scheduled USAir flight to Pittsburgh after a two-hour layover. (Id. at p 17). This change in their flight required the Adiutoris to transfer in Phoenix from Terminal Four, where America West was located, to Terminal Two, where USAir was located, a distance of approximately 1 1/2 miles. Concerned about her father's ability to manage this transfer, Mrs. Magnotto spoke with both USAir and America West officials at the Tucson airport about arranging for a wheelchair to be waiting for her father in Phoenix upon his arrival. (Id. at pp 19-20).
 
 
 7
 Upon his arrival in Phoenix on the America West flight, a wheelchair was waiting for Mr. Adiutori, as requested. The Adiutoris were greeted by an unidentified skycap from appellee, Ogden Aviation Services, International ("Ogden"), who pushed the appellant in the wheelchair to a shuttle bus stop for his trip to the USAir terminal located 1 1/2 miles away. Mr. and Mrs. Adiutori did not give the skycap any instructions, nor did they make any requests of him while en route to the shuttle bus stop. (ER, Ex. 12 at 31-32). The skycap allegedly told Mr. Adiutori to get out of the wheelchair when they reached the bus stop. (ER, Ex. 2 at 3, ER, Ex. 12 at 30). Mr. Adiutori got out of the wheelchair without any assistance, tipped the skycap three dollars, and said good-bye. He did not protest having to leave the wheelchair behind or even indicate that this would be a potential problem. (ER, Ex. 12 at 37-38).
 
 
 8
 There were no seats available at the bus stop, and appellant had to stand against a wall for approximately four to five minutes using his two canes for support, which caused him some back pain. After four or five minutes, a somewhat elderly woman offered her seat to Mr. Adiutori. However, Mr. Adiutori refused her offer, because, in his own words, "it was a woman, and she was a little elderly, and I can stand the pain." (ER, Ex. 12 at 34, America West and Ogden's Supplemental Excerpt Record ("SER"), Ex. 11 at 120). When asked in his deposition why he did not request a seat from anyone else, Mr. Adiutori responded by saying, "I'm very independent." (ER, Ex. 12 at 34.) After approximately twenty minutes, a regular non-handicapped accessible shuttle bus arrived. (ER at Ex. 12 at 13.) At no time did the Adiutoris request assistance in arranging for a handicapped-accessible shuttle bus. Mr. Adiutori and his wife attempted to board at the back door. Without requesting any assistance from the shuttle bus driver, Mr. Adiutori climbed the three large steps when getting on and off the bus. (ER, Ex. 12 at 16-17.) Mrs. Adiutori testified that he refused the offer of another passenger for help and that she had to help him get onto the bus by pushing him up by his buttocks. (ER at Ex. 13 at 18.) Mr. Adiutori admitted that he did not ask anyone for help because "[he didn't] need any help." (ER, Ex. 12 at 36.)
 
 
 9
 When the Adiutoris arrived at the USAir terminal, Mr. Adiutori requested a wheelchair, and he was taken into the terminal where he and his wife ate in a restaurant while waiting for their 3 1/2 hour flight to Pittsburgh. (ER at Ex. 12 at 21-22.) The Adiutoris got on their flight without further incident. (ER at Ex. 12 at 23-24.) However, approximately forty-five minutes before arrival in Pittsburgh--almost a full five hours after he had to climb on and off of the shuttle bus--Mr. Adiutori began complaining of chest pains and shortness of breath. (ER at Ex. 3 at p 28.) When the plane arrived in Pittsburgh, Mr. Adiutori was transported by ambulance to a hospital where he was diagnosed with an inferior and posterior wall myocardial infarction. (ER at Ex. 2 at p 28.)
 
 
 10
 Appellant filed suit in the United States District Court for the District of Arizona on July 16, 1993, alleging that appellants Sky Harbor, the City of Phoenix (the "City"), USAir, America West Airlines ("America West"), Ogden, and Complete Sky Cap Services[1] violated the Air Carriers Access Act ("ACAA"), the Americans with Disabilities Act ("ADA"), and asserting various pendent state claims.[2] (ER at Ex. 1.) The district court dismissed all of appellant's claims on summary judgment.
 
 DISCUSSION
 1. STANDARD OF REVIEW
 
 11
 We review a grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995). The appellate court's review is governed by the same standard used by the trial court under Fed.R.Civ.P. 56(c). Jessinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Warren, 58 F.3d at 441. The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. Jessinger, 24 F.3d at 1130. When a mixed question of fact and law involves undisputed underlying facts, summary judgment is appropriately granted. Union School Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir.1994), cert. denied, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994). Summary judgment is not proper, however, if material factual issues exist for trial. Warren, 58 F.3d at 1441.
 
 2. CLAIMS UNDER THE AIR CARRIERS ACCESS ACT
 
 12
 Appellant contends that USAir and America West[3] violated 49 U.S.C. § 1374(c), the Air Carriers Access Act ("the ACAA"), by unjustly discriminating against him by failing to make reasonable accommodations due to his handicap. Section 1374(c) provides:
 
 
 13
 (1) No air carrier may discriminate against any otherwise qualified handicapped individual, by reason of such handicap, in the provision of air transportation;
 
 
 14
 (2) For the purposes of paragraph (1) of this subsection the terms "handicapped individual" mean any individual who has a physical or mental impairment, or is regarded as having such an impairment. 49 U.S.C. § 1374(c).[4]
 
 
 15
 Although Section 1374(c) does not expressly provide for a private cause of action for "otherwise qualified handicapped individuals," we are persuaded by the reasoning of other circuits which have held that Section 1374(c) implies a private right of action for "otherwise qualified handicapped individuals" under the test enunciated in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). See Shinault v. American Airlines, 936 F.2d 796, 800 (5th Cir.1991); Tallarico v. Trans World Airlines, 881 F.2d 566, 570 (8th Cir.1989). None of the parties disputes that appellant is an "otherwise qualified handicapped individual."
 
 
 16
 Appellant alleges that USAir and America West breached their duty under the ACAA by leaving him at the shuttle bus stop unattended and forcing him to negotiate the three steps up to the bus without assistance. Specifically, appellant states that USAir and America West violated 14 C.F.R. § 382, the regulatory guidelines implementing the ACAA. Appellant contends that America West violated 14 C.F.R. § 382.39(a)[5] by failing to provide the assistance requested by appellant and his daughter, and USAir breached 14 C.F.R. § 382.33(f)[6] by failing to provide adequate assistance to America West in securing the accommodation requested by appellant.
 
 
 17
 We agree with the district court that the record shows otherwise. While appellant's daughter, Mrs. Magnotto, swears that she asked her travel agent to have her father's ticket "identify him as wheelchair dependent," (ER, Ex. 4 at p 11), she does not allege that she directly told anyone at USAir and/or America West that her father was "wheelchair dependent." Rather, Mrs. Magnotto simply requested that her father receive wheelchair assistance. The record reflects that he received wheelchair assistance when he deplaned from the America West flight in Phoenix. He was taken by wheelchair to the shuttle bus stop where he waited for a bus to take him to the USAir terminal. However, Mr. Adiutori contends that USAir and America West violated the ACAA because the skycap who brought him to the shuttle bus stop did not call a wheelchair-accessible shuttle bus to take him to the USAir terminal and left him at the stop without offering further assistance.
 
 
 18
 The record is clear, however, that while appellant was able to demand assistance when he felt he needed it,[7] he never asked the skycap, any America West official, or the shuttle bus driver for assistance in boarding the bus or for the use of a wheelchair-accessible bus. Appellant was asked several times in his deposition why, if he needed assistance, he never asked anyone for any help. He repeatedly testified that he was "not the complaining type," (ER, Ex. 12 at 32), that he was "too independent for that," (ER, Ex. 12 at 36), that he "ask[s] nothing from nobody," (ER, Ex. 12 at 53), and that he is the kind of person who would not ask for "charity and help" no matter how difficult a situation he was in "even if it kills [him]." (ER, Ex. 12 at 54). In fact, the record indicates that appellant felt that he did not need any help getting on the bus, as long as he had his two canes. See ER, Ex. 12 at 42 ("I don't need any help with my two canes I can do good.") In his deposition, appellant specifically testified that even if the wheelchair attendant had remained, he would not have asked for help managing the stairs of the bus, that he had to do it on his own, and that nobody could help him manage those stairs. (ER, Ex. 12 at 54). Furthermore, appellant admits that he refused two separate offers of help from fellow passengers. See ER, Ex. 12 at 34. An Ogden official testified that its employees are trained to take their cues for their disabled passengers. (ER, Ex. 17 at p 7). When appellant, who stated that he possesses a commanding voice, failed to inform the skycap that he wanted the wheelchair to remain, we find that it was reasonable for the skycap to leave. Given that appellant was able to walk with the assistance of his two canes, albeit slowly, and that he made no objection to the skycap leaving, we find that appellant has failed to show that America West has breached its duty to provide requested assistance under the ACAA.
 
 
 19
 Likewise, USAir has not breached its duty under the ACAA to make certain "to the maximum extent feasible" that America West would assist appellant in reaching the USAir terminal. See 14 C.F.R. § 382.33(f). Appellant now argues that USAir failed in its duty because it only informed America West that he required "wheelchair assistance," rather than stating that he was "wheelchair dependent" and required "complete service between terminals." (Blue Br. at 19.) However, as the district court pointed out, appellant's daughter only requested "wheelchair assistance" when she spoke with USAir. (ER, Ex. 4 at pp 19-20.) Appellant's daughter testified that the only time she asked that her father be identified as "wheelchair dependent" was when she spoke to the travel agent. (ER, Ex. 4 at p 11). Because USAir correctly imparted that information to America West, it had no further duty under section 382.33(F) in transporting appellant from the America West terminal.[8]
 
 3. AMERICANS WITH DISABILITIES ACT
 
 20
 Appellant alleges that Ogden and the City violated 42 U.S.C. § 12182, the ADA, by failing to provide reasonable accommodations necessary to allow handicapped individuals access and use of the handicapped-accessible shuttle bus in Sky Harbor. The ADA at 42 U.S.C. § 12182(a) states:
 
 
 21
 No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, and advantages or accommodations of any place or public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.
 
 
 22
 Ogden has a permit to conduct business in the airport terminal, but appellant has failed to provide any evidence that Ogden is covered by section 12182(a). Ogden was not the owner, lessor, lessee, or operator of the airport terminal. Therefore, the district court was correct in dismissing appellant's ADA claim against Ogden.
 
 
 23
 There is no doubt, however, that the City has a duty under the ADA as the owner of the airport. As such, appellant contends that the City breached its duty under 49 C.F.R. § 37.173[9] to train Ogden and Valley Coach[10] personnel. The district court correctly noted that the affidavits of Carol Knowles, the general manager for Valley Coach, and Gilbert Prado, the manager of operations for Ogden, which outlined the specialized training that their personnel received in dealing with disabled travelers,[11] had not been controverted by appellant. See ER at Ex. 10, 17. As a result, appellant is unable to demonstrate that summary judgment was improper.
 
 4. PROXIMATE CAUSATION
 
 24
 Appellees argue that appellant has been unable to show with respect to both his federal and state claims that the events at the shuttle bus stop were the proximate cause of his myocardial infarction approximately five hours later. Proximate causation is ordinarily a question of fact for the jury. Robertson v. Sixpence Inns of America, Inc., 789 P.2d 1040, 1047 (Ariz.1990). However, when a jury is left to speculate on causation or when reasonable persons could not differ on the inferences derived from the evidence, the court may rule as a matter of law. Id. To meet his burden, appellant need only present evidence from which reasonable persons could infer that appellees' behavior contributed to his heart attack. Id.
 
 
 25
 Appellant relies principally on the testimony of his general surgeon, Dr. Henry B. Karpinsky. Dr. Karpinsky initially testified in his deposition that "[w]ithout any reasonable doubt the patient's myocardial condition was brought on by this difficulty [physical stress at the Phoenix airport]." (ER, Ex. 15 at 3.) However, as the district court found, when Dr. Karpinsky became aware that appellant's heart attack occurred at least three hours after appellant climbed the three steps onto the shuttle bus, he stated that he could not determine the relationship between the heart attack and stepping onto the bus. (Id. at 7.) Moreover, appellant's cardiologist, Dr. Robert F. Ferraro, agreed that five hours was generally too long a time lag for appellant's heart attack to be related to the events at the shuttle bus stop. (ER, Ex. 14 at 7-8.) Given that appellant was unable to produce a single witness who could say with any reasonable degree of medical certainty that appellant's heart attack was caused by the incident on the stairs of the shuttle bus, we find that appellant has failed to provide enough evidence for a jury to reasonably conclude that there was proximate causation.
 
 5. STATE LAW CLAIMS
 
 26
 Appellant also has pendent state claims for intentional and/or negligent infliction of emotional distress and negligence.[12] These too were properly dismissed.
 
 
 27
 a. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
 
 
 28
 To make out a claim for intentional infliction of emotional distress, appellant must establish the following:
 
 
 29
 (1) that the defendants' behavior was "extreme" and outrageous;
 
 
 30
 (2) the defendants must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from their conduct; and
 
 
 31
 (3) severe emotional distress must indeed occur as a result of defendants' conduct.
 
 
 32
 Ford v. Revlon, 734 P.2d 580, 585 (Ariz.1987) (relying on the Restatement (Second) of Torts § 46). Arizona courts have stated that there is liability only:
 
 
 33
 where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community ... in which ... an average member of the community would ... exclaim, "Outrageous!"
 
 
 34
 See e.g., Ford, 734 P.2d at 585. The Arizona courts have also made clear that it is for the court to determine in the first instance whether defendants' conduct was sufficiently outrageous. Watts v. Golden Age Nursing Home, 619 P.2d 1032, 1035 (Ariz.1980).
 
 
 35
 To support his claim, appellant argues that he was humiliated by having to get onto the shuttle bus with the help of his wife pushing him up on his buttocks. (Blue Br. at 31.) We find that appellant has failed to make a showing that any of appellee's behavior was so outrageous that it could be considered "utterly intolerable in a civilized society." Accordingly, the district court was correct in dismissing his claims for intentional infliction of emotional distress.
 
 
 36
 b. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
 
 
 37
 Appellant's claim for negligent infliction of emotional distress also fails because of appellant's inability to show proximate causation. However, we find that even if appellant had shown proximate causation that his negligent infliction claim would still have been properly dismissed. To prevail on a claim for negligent infliction of emotional distress, appellant must not only show that an actual physical injury was proximately caused by appellees' conduct, but he must demonstrate that appellees' negligent conduct created an unreasonable risk of bodily harm. Keck v. Jackson, 593 P.2d 668, 669 (Ariz.1979). Arizona courts have held that summary judgment is proper when a plaintiff is unable to sustain this burden. Rowland v. Union Hills Country Club, 757 P.2d 105, 108 (Ariz.App.1988). Allowing appellant, a man who is able to walk and regularly climb eighteen stairs in his home, to go up three steps into a shuttle bus, does not constitute an unreasonable risk of bodily harm. Thus, we find that the district court correctly granted summary judgment as to Mr. Adiutori's negligent infliction of emotional distress claims.
 
 
 38
 c. NEGLIGENCE
 
 
 39
 To assert a claim for negligence, appellant must show that appellees had a duty of reasonable care, that the duty was breached, and that an injury was proximately caused by the breach. Robertson, 789 P.2d at 1044. As stated above, appellant is unable to demonstrate that his heart attack was proximately caused by appellees' behavior in leaving appellant at the shuttle bus stop.[13] Therefore, the district court properly dismissed appellant's claims.
 
 
 40
 AFFIRMED.
 
 
 
 *
 The Honorable Sarah S. Vance, United States District Judge for the Eastern District of Louisiana, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 By the time the district court ruled on the summary judgment motion, Complete Sky Cap Services was no longer a party
 
 
 [2]
 Those claims included intentional and negligent infliction of emotional distress, negligence, and breach of contract
 
 
 [3]
 Appellant concedes that neither the City nor Ogden are air carriers. Therefore, summary judgment was proper as to those appellees
 
 
 [4]
 The Court notes that 49 U.S.C. § 1374 was repealed by Congress on July 5, 1994. Pub.L. 103-272, § 7(b), 108 Stat. 1379. However, since the events in question all took place prior to July 5, 1994, this case is unaffected by the repeal
 
 
 [5]
 Section 382.39(a) provides as follows:
 Carriers shall ensure that qualified handicapped individuals are provided the following services and equipment:
 (a) Carriers shall provide assistance requested by or on behalf of qualified handicapped individuals, or offered by air carrier personnel and accepted by qualified handicapped individuals, in enplaning and deplaning. The delivering carrier shall be responsible for assistance in making flight connections and transportation between gates.
 (1) This assistance shall include, as needed, the services personnel and the use of ground wheelchairs, boarding wheelchairs, on-board wheelchairs where provided in accordance with this part, and ramps and mechanical lifts.
 
 
 [6]
 Section 382.33(f) provides as follows:
 (f) If a qualified handicapped individual provides advance notice to a carrier, and the individual is forced to change to the flight of a different carrier because of the cancellation of the original flight or the substitution of inaccessible equipment, the first carrier shall, to the maximum extent feasible, provide assistance to the second carrier in providing the accommodation requested by the individual from the first carrier.
 
 
 [7]
 For example, the record reflects that when appellant arrived at the USAir terminal in the shuttle bus, he requested a wheelchair, and a representative from USAir complied. (America West and Ogden SER, Ex. 11 at 65.)
 
 
 [8]
 Appellant also alleges emotional distress damages under the ACAA for the humiliation he allegedly suffered by having his wife push him up by the buttocks to get him into the shuttle bus. Because appellant's ACAA claim falls on other grounds, we need not decide whether emotional distress damages are available under the ACAA. See Shinault, 936 F.2d at 804 (holding that all remedies, including damages for emotional distress, available under the ACAA0; Tallarico, 881 F.2d at 570-71 (holding emotional distress damages available under the ACAA); c.f., Americans Disabled for Accessible Public Transp. v. SkyWest Airlines, Inc., 762 F.Supp. 320, 326-27 (D.Utah 1991) (holding emotional distress damages not available under the ACAA)
 
 
 [9]
 Section 37.173 provides in pertinent part:
 Each public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they ... properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.
 
 
 [10]
 Valley Coach is the bus company that provides the handicapped access shuttle buses
 
 
 [11]
 Knowles stated that she personally trained all Valley Coach bus drivers about the ADA's requirement for assisting disabled passengers. The drivers were trained to contact the driver of the handicap access bus if their own buses were not accessible and to assist disabled passengers in exiting and entering the bus. (ER, Ex. 10, pp 14-15.) Prado explained that Ogden personnel watch a videotape entitled, "Transportation of the Handicapped Traveler." (ER, Ex. 17, p 6.) In addition, they are trained "to take their cues from the passenger and to respond as requested." (Id. at p 7.) This takes into account the differences each disabled passenger has in his or her need for assistance. (Id.)
 
 
 [12]
 Appellant does not contest the district court's dismissal of his breach of contract claim. (Blue Br. at 29.)
 
 
 [13]
 Appellant also alleges that he suffered emotional distress damages caused by the allegedly tortious conduct of appellees. However, for the reasons stated in the section on the ACAA, appellant's tort claim fails because he has failed to show a breach of duty by appellees, even assuming appellees had a heightened duty to the appellant as set out in Southern Pacific Co. v. Buntin, 94 P.2d 639, 641 (Ariz.1939) (holding that carriers have a heightened duty toward its physically or mentally infirm passengers)