Larry ADIUTORI, Plaintiff,

v.

SKY HARBOR INTERNATIONAL AIR-
PORT, owned and operated by the City
of Phoenix; The City of Phoenix; State
of Arizona; U.S. Air, Inc.; America West
Airlines; Ogden Aviation Services, Inter-
national; and Complete Sky Cap Ser-
vices, Defendants.

No. CIV 93–1427 PHX PGR.

United States District Court,
D. Arizona.

March 22, 1995.

F. Joseph Walsh, Tucson, AZ, for plaintiff.

Robert L. Greer, Andrew Woodhouse Gould, Mesa, AZ, Michael W. Carnahan, Stephen C. Yost, Phoenix, AZ, for defendants.

## MEMORANDUM OPINION AND ORDER

ROSENBLATT, District Judge.

Pending before the Court is the plaintiff's Motion for [Partial] Summary Judgment, defendant U.S. Air's (USAir) Cross–Motion for Summary Judgment, defendant City of Phoenix's (Phoenix) Cross–Motion for Summary Judgment, and defendants America West Airlines (America West) and Ogden Air Service's (Ogden) Cross–Motion for Summary Judgment.[1] Having considered the parties' memoranda in light of the entire record and the oral argument of counsel, the Court finds that there are no genuine issues of material fact and that the defendants are all entitled to entry of judgment in their favor pursuant to Fed.R.Civ.P. 56 as to all claims against them.

## BACKGROUND

Plaintiff Larry Adiutori filed this action on July 16, 1993 for damages stemming from a heart attack he suffered on February 18, 1993 on a USAir flight from Phoenix to Pittsburgh, allegedly caused by the defendants' failure to provide him with proper handicap services while in transit between terminals at Sky Harbor International Airport, which is owned and operated by Phoenix. On February 18, 1993, the plaintiff was 73 years old, was 5'3" tall and weighed over 300 pounds, and had severe arthritis of his knees which left him with the ability to walk only with great difficulty using two canes. On' that date, the plaintiff and his wife returned to their home in Pittsburgh after visiting their daughter in Tucson; they were traveling on round-trip airline tickets purchased by their daughter from USAir. Because USAir had to cancel the Tucson–Phoenix portion of the return flight to Pittsburgh, it arranged for the plaintiff and his wife to fly to Phoenix on America West and then transfer to their scheduled USAir flight to Pittsburgh; there was a two hour layover in Phoenix. The change in their flight required the plaintiff and his wife to transfer from Terminal Four, where America West was located, to Terminal Two, where USAir was located, a distance of approximately 1½ miles. The plaintiff's daughter requested from both USAir and America West upon checking in at the Tucson airport that a wheelchair be waiting in Phoenix for the plaintiff. Upon arrival in Phoenix at about 10 p.m., an unidentified skycap, allegedly employed by Ogden, pushed the plaintiff in a wheelchair from the America West arrival gate to a shuttle bus stop, where he told the plaintiff: "This is where you get off. This is where the bus stop is."; neither the plaintiff or his wife gave the skycap any instructions or made any requests of him while en route to the bus stop, other than to tell him they were going to USAir. The plaintiff got out of the wheelchair at the bus stop without any help and without any protest about having to get out of the wheelchair and tipped the skycap $3.00. There were no empty seats available at the bus stop when the plaintiff and his

1. These defendants are the sole remaining defendants in this action.

wife arrived and the plaintiff had to stand using his canes and leaning against a wall, which caused him back pain. After four or five minutes a somewhat elderly woman offered the plaintiff her seat but he refused to take it; he also did not ask anyone else if he could use one of the other seats. A regular, non-handicapped accessible shuttle bus arrived after some 20 minutes and the plaintiff and his wife boarded through a back door without speaking to the driver. The plaintiff had to climb three large steps to get into and off the bus, causing him to experience shortness of breath and pain in his back and legs. Another man waiting to board offered to help the plaintiff climb the bus stairs, but the plaintiff refused the offer. The plaintiff was taken by wheelchair from the shuttle bus into the USAir terminal, where he and his wife had a meal while waiting for their flight to Pittsburgh; he was thereafter taken to the USAir departure gate by wheelchair. At no time prior to boarding the bus did the plaintiff or his wife request assistance in arranging for a handicapped accessible shuttle bus, nor thereafter while waiting for the Pittsburgh flight did they complain about the lack of one. The plaintiff experienced chest pains and shortness of breath some 45 minutes before the plane landed in Pittsburgh—almost five hours after he had to climb on and off the shuttle bus. He was taken by ambulance from the plane in Pittsburgh to a hospital where he was diagnosed as having had an interior and postural wall myocardial infarction. The plaintiff lives in a two story house in Pennsylvania with an upstairs bedroom; three or four nights a week he slowly climbs the 18 stairs using his canes to sleep upstairs and rest of the time he sleeps downstairs. The plaintiff was in a command position in the military and in veterans' organizations. He runs a business taking care of 60 rental properties and even after his heart attack he was working 10–12 hours a day, seven days a week supervising his crews.

## DISCUSSION

### FEDERAL CLAIMS

#### Air Carriers Access Act

Count I of the complaint alleges that the defendants violated 49 U.S.C. § 1374(c), the Air Carrier Access Act of 1986 (ACAA), by "unjustly discriminating against Plaintiff by failing to make the reasonable accommodations Plaintiff's handicap requires." § 1374(c) provides:

(1) No air carrier may discriminate against any otherwise qualified handicapped individual, by reason of such handicap, in the provision of air transportation. (2) For the purposes of paragraph (1) of this subsection the term "handicapped individual" means any individual who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

The regulations implementing the ACAA are set forth in 14 C.F.R. Part 382. No party disputes that the ACAA impliedly provides for a private right of action, *Shinault v. American Airlines, Inc.,* 936 F.2d 796, 800 (5th Cir.1991); *Tallarico v. Trans World Airlines, Inc.,* 881 F.2d 566, 570 (8th Cir. 1989), and no defendant seriously disputes that the plaintiff is a handicap person for the purposes of the statute. 14 C.F.R. § 382.5 defines a major life activity in its definition of "handicapped individual" to include walking and the Court finds that the evidence of record establishes that the plaintiff's difficulty in walking stemming from his debilitating arthritis of his knees fits that definition.

Although the complaint alleges that all of the defendants violated the ACAA and the plaintiff argued in his response to America West and Ogden's summary judgment motion that Ogden violated the ACAA, the plaintiff's position at the time of oral argument was that this claim did not apply either to Phoenix or Ogden since neither is an air carrier. Given the plaintiff's concession and the applicable definitions in 49 U.S.C. § 1301 and 14 C.F.R. § 382.5, the Court concludes that Count I is limited to USAir and America West.

The plaintiff argues that USAir and America West breached their duty to him under the ACAA by (1) forcing him to wait for a wheelchair upon disembarking the America West flight from Tucson, and (2) forcing him to get out of the wheelchair at the shuttle

bus stop and leaving him stranded and unaided in negotiating the shuttle bus steps. The plaintiff argues that U.S. Air violated 14 C.F.R. § 382.33(f), which provides:

> (f) If a qualified handicapped individual provides advance notice to a carrier, and the individual is forced to change to the flight of a different carrier because of the cancellation of the original flight or the substitution of inaccessible equipment, the first carrier shall, to the maximum extent feasible, provide assistance to the second carrier in providing the accommodation requested by the individual from the first carrier. (Emphasis added).

The plaintiff argues that America West violated 14 C.F.R. § 382.39, which provides in pertinent part:

> Carriers shall ensure that qualified handicapped individuals are provided the following services and equipment:

> (a) Carriers shall provide assistance requested by or on behalf of qualified handicapped individuals, or offered by air carrier personnel and accepted by qualified handicapped individuals, in enplaning and deplaning. The delivering carrier shall be responsible for assistance in making flight connections and transportation between gates.

> (1) This assistance shall include, as needed, the services personnel and the use of ground wheelchairs, on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.

> \* \* \* \* \* \*

> (3) Carriers shall not leave a handicapped passenger unattended in a ground wheelchair, boarding wheelchair, or other device, in which the passenger is not independently mobile, for more than 30 minutes. (Emphasis added).

■ The Court finds that the plaintiff has not met his burden of establishing a violation of ACAA, which the Court notes is not a strict liability statute, based upon his argument that he had to wait for a wheelchair after deplaning the America West flight. Although the plaintiff's affidavit states that a wheelchair was not waiting for him in Phoenix as requested in Tucson and that one was eventually brought, he testified at his deposition that a wheelchair was waiting for him in the jetway outside the plane door upon arrival; his wife testified at her deposition that a wheelchair was not waiting, that they had to ask for one, that they stood for five or ten minutes until one arrived, and that the first wheelchair was too small and a second one had to be brought. Even if the plaintiff's wife's testimony is credited, the plaintiff has not established how a five to ten minute wait for a wheelchair violated the ACAA, especially since there is no evidence that the plaintiff suffered any adverse consequences from the *de minimis* delay.

■ The plaintiff's main theory of an ACAA violation is based upon him having to wait at the shuttle bus stop without a wheelchair and having to board the regular shuttle bus without assistance. The defendants' main defense to this is that the plaintiff never requested that he be allowed to keep the wheelchair at the bus stop, that he did not ask about the availability of handicapped accessible shuttle vans, that he refused the offer of a seat while waiting for the bus, and that he did not ask for help in boarding the bus and refused what help was offered.

■ Although the plaintiff asserts that the defendants' contention that the "Plaintiff's failure to request that he be allowed to remain seated in the wheelchair, and failure to request further assistance, negates any responsibility owed Plaintiff … is as defective as the assistance provided to Plaintiff[,]" he does not establish why that is so. The regulations implementing the ACAA, when read as a whole, do not force air carriers to provide unrequested assistance to handicapped individuals. As an initial matter, the regulations refer to "qualified handicapped individuals", and such an individual is defined in 14 C.F.R. § 382.5 as a handicapped individual who "(a) With respect to … use of ground transportation, … takes those actions necessary to avail himself or herself of facilities or services offered by an air carrier to the general public, with reasonable accommodations, as needed by the carrier." (Emphasis added). Many of the regulations refer to the duty to provide assistance requested by handicap individuals. For example, 14

C.F.R. § 382.39(a), upon which the plaintiff relies, states that "[c]arriers shall provide assistance requested by or on behalf of qualified handicapped individuals, or offered by air carrier personnel and accepted by qualified handicapped individuals, in enplaning and deplaning." (Emphasis added). 14 C.F.R. § 382.39(a)(1), upon which the plaintiff also relies, requires the delivering carrier to provided assistance between gates "as needed." Furthermore, it is a violation of the ACAA to force handicapped individuals to accept services they do not request inasmuch as 14 C.F.R. § 382.7(a)(2) provides in pertinent part that

(a) A carrier shall not, directly or through contractual, licensing or other arrangements:

\* \* \* \* \* \*

(2) Require a handicapped person to accept special services (including, but not limited to, preboarding) not requested by the passenger.

(3) Exclude a qualified handicapped individual from or deny the person the benefit of any air transportation or related services that are available to other persons, even if there are separate or different services available for handicapped persons ... (Emphasis added)

The evidence of record establishes that the plaintiff requested (or had requested on his behalf) with regard to the return trip to Pennsylvania only that a wheelchair be available for his use in deplaning in Phoenix and Pittsburgh, and that he requested wheelchair assistance after exiting the shuttle bus at the USAir terminal. The evidence clearly establishes that neither he nor his wife ever informed the skycap taking him to the bus stop of the extent of the plaintiff's disability or that the skycap should not leave the plaintiff at the bus stop without the wheelchair, that although the skycap told the plaintiff "This is where you get off. This is where the bus stop is[,]" the skycap did not in fact order the plaintiff out of the wheelchair, that the plaintiff did not protest having to get out of the wheelchair at the bus stop because "I'm not the complaining type" and instead got up unaided upon hearing the skycap's comment and tipped the skycap three dollars and told

him good-bye, that neither the plaintiff or his wife ever inquired of anyone about the availability of handicapped accessible shuttle transportation, that the plaintiff could have had a seat at the bus stop but refused it "[b]ecause it was a woman [offering it], and she was a little elderly, and I can stand the pain [of standing]", that the plaintiff did not ask anyone else waiting at the bus stop for their seat because "I'm very independent", that neither the plaintiff or his wife ever requested any assistance from the shuttle bus driver or any information about handicap services and entered and exited the bus through a rear door, as opposed to the door next to the driver, and that the plaintiff refused an offer of assistance from a fellow passenger in climbing the steps because he did not believe anyone could help him due to his obesity. The plaintiff's deposition establishes that he is a very proud and independent man who refuses to ask for assistance:

Q. There were a variety of people at the bus stop that you could have asked for help to get up those steps if you had wanted to ask. True or false?

\* \* \* \* \* \*

A. I ask nothing from nobody. Okay? I give. And if I'm capable of taking care of myself, regardless of 200 people there, regardless how much I'm suffering, I'll still take care of myself.

\* \* \* \* \* \*

Q. And you are the kind of guy who, when presented with a situation, no matter how difficult it is, you are going to do it because you are not going to ask for charity and help.

A. Even if it kills me. Okay?

\* \* \* \* \* \*

Q. Even if the wheelchair attendant had remained, you were not going to ask him for help up the steps; you were going to do it on your own.

A. I have to do it on my own. Nobody can help me up the steps.

The plaintiff's deposition also establishes that he is no wall flower and knows how to give orders when he deems it necessary given his military command experience and his long-

time ownership of his own substantial business. For example, he testified that "I have a very commanding voice when I want to have it. I'm from the military." The evidence also establishes that the plaintiff is mobile to some extent using his canes, e.g. he walks, albeit slowly, up and down eight small steps outside his home, the 18 steps inside his home, he walked on and off the airplane, he can walk some 100 feet if he takes breaks, etc.; he testified at his deposition that "I'm self-supporting 90 percent of the time even if I am crippled."

■ Even if the ACAA was somehow violated, the plaintiff has not established that any defendant is responsible for his damages proximately caused thereby other than perhaps America West which under 14 C.F.R. § 382.39 had, as the delivering carrier, the responsibility for providing the assistance "requested" in "making flight connections and transportation between gates." Although USAir was required by 14 C.F.R. § 382.33(f) to provide assistance to America West "to the maximum extent feasible" in providing "the accommodation requested" by the plaintiff, the plaintiff has not established that U.S. Air had the legal obligation to do more than it did. The evidence of record establishes that the plaintiff's daughter requested of USAir in Tucson that a wheelchair be available in Phoenix for the plaintiff and one was available. As USAir points out, it does not have any control over the wheelchair assistance actually provided by America West or Ogden, with which USAir has no contract, in a terminal 1½ miles away, nor does it have any control over the interterminal shuttle bus system owned by Phoenix and operated by a private contractor under contract with Phoenix. The plaintiff's defense to USAir's arguments, which is simply that summary judgment is inappropriate because reasonable minds could differ as to whether USAir's obligations to perform were discharged within the meaning of the ACAA, is insufficient to defeat summary judgment.

■ In any case, none of the defendants had any control over the extent of the plaintiff's use of the wheelchair provided to him— under the ACAA, the plaintiff had the right to have a wheelchair and a handicapped accessible shuttle bus available for his use upon his request, but he also had the right not to use the wheelchair or the handicap shuttle bus if he choose not to do so. The plaintiff simply has not established that there is anything in the ACAA that provides that air carriers must guess what special services, or the extent of those services, a handicapped passenger requires. Ogden's policy, as established by the uncontroverted affidavit of Gilbert Prado, its operations manager, complies with the spirit of the ACAA in that its policy is to respect the independence of disabled passengers by taking cues from them and responding with assistance when and as requested. The plaintiff's failure to affirmatively communicate that he wanted or needed assistance in connection with the shuttle bus is sufficient to defeat his ACAA claim.

*Americans with Disabilities Act*

Count II of the complaint alleges that the defendants violated 42 U.S.C. § 12182, the Americans with Disabilities Act (ADA), "by failing to provide Plaintiff the reasonable accommodations necessary to allow Plaintiff access and use of airport facilities." Although the count refers to all defendants, the plaintiff subsequently limited its application just to Ogden and Phoenix in his summary judgment motion, and then just to Phoenix in his responses to the defendants' cross-motions. However, in his oral argument, the plaintiff again argued that Ogden's conduct breached the ADA. The Court therefore assumes that the plaintiff's ADA claim is against both Phoenix and Ogden.

■ The Court concludes that the plaintiff has not established that Ogden falls within the terms of the ADA with regard to services it rendered to the plaintiff. The plaintiff's summary judgment motion argues that Ogden violated · Subchapter III of the ADA which provides in 42 U.S.C. § 12182(a) that

[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

**704**

42 U.S.C. § 12181(7)(g) provides that private entities considered to be public accommodations include "a terminal, depot, or other station used for specified public transportation." The plaintiff asserts, without any legal citation other than the statute, that Ogden "is bound by this statute by the fact that it is a private entity providing a service in a 'terminal, depot or other station used for specified public transportation.'" But § 12182 does not state that it applies to entities which merely provide a service in a place of public accommodation, e.g. a terminal, etc.—it only applies to entities which own, lease or operate a place of public accommodation and the plaintiff does not explain how Ogden fits into that definition. The only evidence of record concerning Ogden's relationship to Phoenix is that Ogden possesses a permit from Phoenix, which is the owner and operator of Terminal Four, to conduct business therein.

Although there is no doubt that the provisions of the ADA apply to Phoenix's operations at the airport since it is the owner and operator of the airport, the Court concludes that the plaintiff has not established that Phoenix violated any provision of the ADA. The plaintiff argues in his summary judgment motion that Phoenix violated Subchapter II of the ADA, specifically 42 U.S.C. § 12132, which provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The transportation services section of the ADA is implemented by the regulations set forth in 49 C.F.R. Part 37, and Appendix D thereto which construes and interprets the provisions of Part 37.

■ The plaintiff's summary judgment motion and his response to Phoenix's cross-motion do not establish how Phoenix violated the ADA; the plaintiff merely asserts that Phoenix has a duty to have an interterminal transportation system that is readily accessible and usable by handicapped persons in order to ensure that persons using the airport facilities are not denied the benefits of its services, programs, or activities, and a duty to ensure that Ogden personnel were appropriately trained, and that Phoenix breached these duties by "failing to ensure that [the plaintiff] received adequate assistance and equipment to allow him to use the facilities of the airport." However, the plaintiff concedes that Phoenix had no duty under the ADA in February 1993 to have all of its shuttle buses be wheelchair accessible, and he has failed to establish that the airport's shuttle bus system did not comply with the ADA. Phoenix, on the other hand, has established through the affidavits of Carol Knowles, the general manager of Valley Coach, the private contractor operating the airport's interterminal shuttle bus system, and Bunny Coleman, Valley Coach's office manager, that the shuttle bus system was being operated in February 1993 in conformance with the requirements of the ADA. At that time, Valley Coach operated two wheelchair accessible shuttle vans 24 hours a day, seven days a week; these vans employed the "advantage van concept", which allowed the vans to lower themselves to the curb and extend a ramp for wheel chair access. The handicap vans could be contacted at all times by various airport personnel who had been trained by Valley Coach to do so, including skycaps, information booth personnel, ground transportation officials, and drivers of regular shuttle buses; the vans could also be directly contacted by passengers telephoning from special telephones located at ground transportation areas.

■ The plaintiff also conclusorily asserts that Phoenix violated the ADA by failing to properly train Ogden's employees. 49 C.F.R. § 37.173 provides in part:

> Each public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they ... properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities. (Emphasis added).

Appendix D to Part 37 elaborates on this by stating in part:

> Finally, one of the important points in training concerns differences among individuals with disabilities. All individuals with disabilities, of course, are not alike. The appropriate ways one deals with persons with various kinds of disabilities ... are likely to differ and, while no one expects bus drivers to be trained as disability specialists, recognizing relevant differences and responding to them appropriately is extremely significant. Public entities who contract with private entities to have service provided ... are responsible for ensuring that contractor personnel receive the appropriate training.

The plaintiff has submitted nothing controverting the affidavit of Gilbert Prado, Ogden's operations manager, which establishes that Ogden's employees were properly trained:

> 5. I have attended seminars concerning the Americans with Disabilities Act ("ADA") and its requirements for disabled travelers.

> 6. Ogden provides training to its Phoenix employees on the provision of assistance to passengers with disabilities as required under the ADA. For this purpose, Ogden uses a videotape entitled "Transportation of the Handicapped Traveler."

> 7. In keeping with the ADA and current training programs on providing assistance to disabled individuals, Ogden's approach to dealing with disabled passengers is to provide assistance as requested, and to always treat the passenger with respect. First, it is impossible for an attendant to know the exact nature and limits of any passenger's disability.... Thus, attendants are trained to take their cues from the passenger and respond as requested. Second, disabled persons often wish to do as much as possible for themselves and do not welcome unsolicited "assistance." Thus attendants are trained to respect the disabled person and to respond when and if requested.

The plaintiff also has submitted nothing controverting the affidavit of Carol Knowles, Valley Coach's general manager, which establishes that Valley Coach's personnel were properly trained:

> 14. Prior to February 1993, I attended a training seminar concerning the Americans With Disabilities Act ("ADA") and its requirements regarding the assistance of handicapped and/or disabled passengers. Subsequent to attending that seminar and prior to February 1993, I personally trained all of any Valley Coach shuttle bus/van drivers as to the ADA's requirements for assisting handicapped and/or disabled passengers.

> 15. As part of the foregoing training, Valley Coach drivers were trained as follows:

> a. if their bus/van was not accessible for wheelchairs, the drivers were to contact a driver of one of the advantage vans ... to transport a passenger in a wheelchair;

> b. for passengers not in a wheelchair but who required assistance in boarding the shuttle bus, the van and/or shuttle bus drivers were trained to assist the passenger to enter and exit the van/shuttle bus, if the passenger requested assistance and/or the bus driver was notified of the passenger's need for assistance; ...

Although the plaintiff argues that assistance should have been provided to him because the "[t]he shuttle bus driver clearly observed an elderly, obese, cane-supported individual, Larry Adiutori, who required assistance in negotiating his ascent to the shuttle bus", the record does not support this assertion. The record does not even establish that the shuttle bus driver ever saw the plaintiff or knew of his disability since the evidence of record is that when the shuttle bus arrived at the bus stop, well after dark, the plaintiff was standing up using his canes, and that he entered and exited the bus through a rear door (there was a front door also available) without ever passing by the driver or speaking to the driver. The ADA, like the ACAA, does not require that assistance be automatically given to persons like the plaintiff; it requires only that appropriate assistance be given on an as requested and on an as needed basis. *See e.g.* 49 C.F.R. Part 37 Appendix D, comment re § 37.165:

People using canes or walkers and other standees with disabilities who do not use wheelchairs but have difficulty using steps (e.g., an elderly person who can walk on a plane without the use of a mobility aid but cannot raise his or her legs sufficiently to climb bus steps) must also be permitted to use the [wheelchair] lift, on request. (Emphasis added).

*Proximate Causation*

■ The defendants argue with regard to both the federal and state claims that the plaintiff has not met his burden of establishing that their alleged misconduct in "forcing" the plaintiff to stand at the bus stop and ascend and descend the bus steps was the proximate causation of his myocardial infarction, which occurred almost five hours after he rode on the shuttle bus. Although the question of proximate cause is ordinarily a question of fact for the trier of fact to resolve, it becomes a question for the Court to resolve when the plaintiff's evidence leaves causation to the trier of fact's speculation or where reasonable persons could not differ on the inference derived from the evidence. *Robertson v. Sixpence Inns of America,* 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990).

■ To meet his burden of proof the plaintiff need only present probable facts from which the causal relationship reasonably may be inferred. *Id.* The plaintiff relies on the deposition testimony of Dr. Karpinsky, his treating Veterans' Administration physician, as evidence that the exertion from the shuttle bus experience caused his heart attack to a reasonable degree of medical certainty. The plaintiff cites the following deposition testimony:

Q. [ON PREVIOUS PAGE NOT PROVIDED]

A. (Dr. Karpinsky) ... And then on the way back to Pittsburgh he was confronted with this difficulty in regards to the transportation of getting to and from Tucson to Phoenix and then to Pittsburgh. And without any doubt this resulted in him having some heart difficulty.

\* \* \* \* \* \*

Q. ... Is it your opinion to a reasonable medical probability that Mr. Adiutori's heart attack was directly caused by the physical stress placed on him at the Phoenix airport?

\* \* \* \* \* \*

A. Without any reasonable doubt the patient's myocardial condition was brought on by this difficulty that he had at the time he was boarding the other—[CONTINUED ON NEXT PAGE NOT PROVIDED].

Although it is a close question, the Court concludes that the plaintiff's evidence constitutes at best only colorable evidence of causation insufficient to defeat summary judgment because Dr. Karpinsky's subsequent testimony, given after being made aware for the first time of the lapse of time between the shuttle bus exertion and the onset of the heart attack, made it clear that he could not affirmatively link the two events:

Q. Doctor, how does the stress as you have said of Mr. Adiutori climbing three steps on a bus relate to a heart attack occurring at least three hours later.

\* \* \* \* \* \*

A. (Dr. Karpinsky) I can't determine that.

\* \* \* \* \* \*

Q. The fact that the complete closure or close to complete closure of that heart vessel occurred on the airplane, does that indicate to you that the physical exertion was not the cause of the heart attack?

A. It's undeterminable.

Furthermore, Dr. Ferraro, the plaintiff's treating cardiologist, testified that the reasonable medical probability was that the plaintiff would have suffered chest pains much earlier than he did if climbing the bus steps caused his heart attack:

Q. [I]f, in fact, climbing three steps caused a fissure and the plaque building up in the lumen of his right coronary artery and a rapid development of thrombus, to a reasonable degree of medical probability, Mr. Adiutori would have had an expression of chest pain much earlier than [he did on the airplane] if, in fact, climbing the steps

had anything to do with his MI. Isn't that a fact?

\* \* \* \* \* \*

A. (Dr. Ferraro) In general I would say that, you know, that would be my impression.

## STATE CLAIMS

Assuming *arguendo* that there is a genuine issue of material fact regarding the issue of proximate causation, the Court finds that the evidence and legal arguments advanced by the plaintiff are insufficient to defeat summary judgment as to any of the pendent state law claims.

### Intentional Infliction of Emotional Distress

Count Three of the complaint alleges a claim for intentional infliction of emotional distress. The defendants argue, and the Court agrees, that the plaintiff has not established a prima facie case for such a claim. The Arizona courts, which have adopted the formulation set forth in Restatement 2d of Torts § 46 for this tort, have required the following factors to be established to prove this claim: (1) that the defendant's conduct was "extreme" and "outrageous", (2) that the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from its conduct, and (3) that severe emotional distress indeed occurred as a result of defendant's conduct. *Ford v. Revlon, Inc.,* 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). In his summary judgment motion the plaintiff argues that he is entitled to judgment as a matter of law on this claim because "[f]orcing [him] out of his wheelchair, requiring him to stand in an area without handicapped facilities, and not providing handicapped access to the shuttle bus is clearly extreme and outrageous conduct." In his responses to the defendants' cross-motions, however, he argues that summary judgment in the defendants' favor is inappropriate because reasonable minds could differ as to whether the defendants' conduct could properly be characterized as extreme or outrageous.

▮ The Court concludes that the evidence of record is at the very least insufficient to meet the first element of the intentional infliction claim. The standard of "outrageousness" followed by the Arizona courts is that set forth in comment d to Restatement § 46, *Ford,* 153 Ariz. at 43, 734 P.2d at 585, which provides that

[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The Arizona courts have made it clear that the "conduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct[,]" *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980), and that it is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Id.* (citing comment h to § 46). Summary judgment is thus appropriate if the conduct at issue is not sufficiently outrageous. *Rowland v. Union Hills Country Club,* 157 Ariz. 301, 304, 757 P.2d 105, 108 (App.1988) (Court affirmed summary judgment because "[t]he conduct complained of in this case, even if proven at trial to be true, is not so far outside the bounds of decency as to cause a reasonable person, upon hearing if it, to shout, 'Outrageous!' ").

▮ The Court concludes that there is insufficient evidence of record establishing that the conduct of any defendant was sufficiently outrageous. In the first place, "a § 46 claim generally requires affirmative conduct[,]" *Pankratz v. Willis,* 155 Ariz. 8, 13, 744 P.2d 1182, 1187 (App.1987), and the defendants' conduct at issue is what they did not do, not what they did do. Secondly, none of the defendants' conduct at issue constitutes the necessary "atrocious and utterly intolerable conduct", *id.* at 15, 744 P.2d at 1189, when viewed in light of the plaintiff's failure to take any affirmative action in seeking assistance other than asking that a

**708**

wheelchair be available at the gate for his use. The defendants were prepared to offer the plaintiff all the handicapped access services he needed if he had but made all of his needs known to them and it is hardly outrageous conduct on the part of the defendants not to treat the plaintiff as more incapacitated than he appears to be. Notwithstanding the plaintiff's argument to the contrary, the evidence of record is that the defendants did not force him out of the wheelchair at the shuttle bus stop; rather, the evidence is that he got out of the chair without protest, and tipped the skycap $3, which, as is pointed out by some of the defendants, in the absence of any communication to the contrary is a universal custom acknowledging the completion of a service well done. Furthermore, the plaintiff was not forced to stand in an area without seating—there was at least one bench to sit on at the bus stop and the plaintiff declined an offer of a seat; nor was the plaintiff denied access to a handicapped accessible bus—such vans were available upon notification that one was needed.

*Negligent Infliction of Emotional Distress*

 Count III of the complaint also includes a claim for negligent infliction of emotional distress. Damages for unintended or negligent infliction of emotional distress are recoverable in Arizona. *Keck v. Jackson,* 122 Ariz. 114, 115, 593 P.2d 668, 669 (1979); *Rowland v. Union Hills Country Club,* 157 Ariz. 301, 304, 757 P.2d 105, 108 (App.1988). The defendants argue that the evidence of record does not establish such a claim and the Court agrees. Assuming *arguendo* that the plaintiff has submitted evidence of an actual physical injury proximately caused by the defendants' conduct, summary judgment in the defendants' favor is appropriate because the plaintiff has not proved that the defendants' negligent conduct created an unreasonable risk of bodily harm to him as is required. *Keck,* 122 Ariz. at 116, 593 P.2d at 670. The Arizona courts recognize that summary judgment is appropriate if the conduct at issue cannot be considered sufficient to create the requisite unreasonable risk of physical injury. *Rowland,* 157 Ariz. at 304, 757 P.2d at 108. The plaintiff's contention is that the defendants knew of the risk of phys-

ical harm to him because of his request for wheelchair assistance and the fact that he walked with two canes. But as previously stated, without the plaintiff somehow informing the defendants of his exact physical condition, limitations, and needs, the defendants could not know all of what they needed to do for him. The evidence of record most favorable to the plaintiff is that his daughter states in her affidavit that when she bought her parents' round-trip tickets she asked USAir to have the tickets show that the plaintiff was "wheelchair dependant" [sic], and that when the plaintiff and his wife checked in at the USAir and America West ticket counters in Tucson for their return trip their daughter requested "wheelchair assistance" for the plaintiff upon his departing the plane in Phoenix and Pittsburgh. The Court concludes as a matter of law that this is insufficient notification that the plaintiff was in danger of suffering a heart attack or other bodily harm if he had to climb onto a regular shuttle bus.

*Negligence*

 Count IV of the complaint alleges that the defendants, by ordering the plaintiff out of the wheelchair and leaving him standing at the bus stop with only his canes for support, breached their duty to "exercise the ordinary and reasonable care of an entity providing wheelchair service to the disabled." In his summary judgment motion and in his responses to the defendants' cross-motions, the plaintiff argues that the defendants, as common carriers, had a heightened duty to assist him in ascending and descending the shuttle bus which they breached.

 To constitute actionable negligence there must be a duty or obligation recognized by law which requires the defendants to conform to a particular standard of conduct in order to protect the plaintiff against unreasonable risks of harm, a breach of that duty, and an injury which is proximately caused by such a breach. *Robertson v. Sixpence Inns of America, Inc.,* 163 Ariz. 539, 543, 789 P.2d 1040, 1044 (1990); *Keck v. Jackson,* 122 Ariz. at 115, 593 P.2d at 669. The existence of a duty is a question of law

to be determined by the Court. The plaintiff relies on the case of *Southern Pacific Co. v. Buntin,* 54 Ariz. 180, 94 P.2d 639 (1939), to support his contention that the defendants owed him a heightened duty because of his disabled condition. The Court cannot conclude that the evidence of record establishes that the common carrier defendants had a heightened duty of care towards the plaintiff under the *Buntin* test, or if they did, that they breached it, or that any such breach involved an unreasonable risk of harm to the plaintiff. The evidence is that the defendants gave the plaintiff such care as his known and observable infirmities required—the evidence is that the plaintiff can walk at least a hundred feet with his canes, that he got out of the wheelchair at the bus stop without assistance, that he was standing up at the bus stop using his canes when the shuttle bus arrived, etc. The evidence also is that complete handicapped access services were available from the defendants upon request.

*Breach of Contract*

 Count V of the complaint alleges that the defendants breached their agreement with the plaintiff, which was that they "expressly and impliedly warranted that they would safely transport and deliver Plaintiff from the area where he departed the plane to the shuttle service." The defendants are entitled to summary judgment on this claim as literally written because there is no evidence that the plaintiff was not safely taken from the arrival gate to the shuttle bus stop—the plaintiff's claim is that he was injured after he arrived at the bus stop by being forced to stand while waiting and having to board the bus without assistance. The plaintiff, however, expands this claim in his summary judgment motion to mean that the contract was that the defendants "warranted" that he would receive assistance in "boarding, deplaning and traveling from terminal to terminal" and that they breached this contract when they "instructed [him] to get out of his wheelchair, left him standing waiting for a bus and failed to provide handicapped access to the shuttle bus."

 The defendants are also entitled to summary judgment on this claim as expanded by the plaintiff because the plaintiff has failed to establish either the existence of an enforceable contract, which requires proof of an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained, or any breach thereof. The plaintiff never explains what "contract" he had with Ogden; furthermore, his explanation of his "contract" with Phoenix not only is devoid of citation to any supporting law, but it confuses statutory duties and/or common law duties implied by law on common carriers with contractual duties. While the airlines and Phoenix had certain duties to provide handicapped access services to the extent needed and requested, those duties do not constitute a "contract" with the plaintiff. *Cf. Barmat v. John and Jane Doe Partners A–D,* 155 Ariz. 519, 523, 747 P.2d 1218, 1222 (1987) (Court held that the essential nature of actions to recover for breach of special duties imposed by law, such as those imposed on common carriers, is not one arising out of contract but one arising out of tort.) In any case, Phoenix did provide for wheelchair accessible shuttle vans and its contractor's drivers were trained to provide appropriate assistance when requested. Although the plaintiff entered into some kind of a contract with USAir and America West, as a third party beneficiary or otherwise, as a result of his daughter purchasing tickets for him, the terms of which are not part of the record, there is no evidence of record establishing the plaintiff's contention that USAir breached its contractual duty to him "when [it] instructed, and made arrangements for [him] to fly with another carrier, namely America West[,]" nor is there any evidence establishing the plaintiff's contention that USAir, America West and Ogden breached their contractual duty to him by leaving him "stranded at curb side with no assistance." There is no evidence that any of these defendants contracted with the plaintiff to provide for handicapped services that the plaintiff never informed anyone he needed or that any of them promised the plaintiff that it would provide transportation between terminals. As noted, the plaintiff's daughter informed USAir and America West that the

**710**

plaintiff needed a wheelchair at the America West arrival gate in Phoenix and one was provided; wheelchair assistance was also provided the plaintiff from the shuttle bus stop at the USAir terminal to the USAir departure gate. Therefore,

IT IS ORDERED that the plaintiff's Motion for [Partial] Summary Judgment (doc. # 29) is denied.

IT IS FURTHER ORDERED that defendant U.S. Air's Cross–Motion for Summary Judgment (doc. # 36), defendant City of Phoenix's Cross–Motion for Summary Judgment (doc. # 51), and defendants America West Airlines and Ogden Air Service's Cross–Motion for Summary Judgment (doc. # 54) are all granted and that the Clerk of the Court shall enter judgment accordingly.