**Harvey KATZOWITZ and Janice Katzowitz, Plaintiffs,**

v.

**LONG ISLAND RAILROAD, Defendant.**

**No. CV963996ADS.**

United States District Court, E.D. New York.

Aug. 3, 1999.

Goldman & Rio, New York City, by Michael Goldman, of counsel, for plaintiffs Harvey Katzowitz and Janice Katzowitz.

Chesney, Murphy & Moran, Baldwin, NY, by Peter J. Verdirame, of counsel, for defendant Long Island Rail Road.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Harvey Katzowitz ("Katzowitz" or the "plaintiff") initiated this lawsuit against the defendant, the Long Island Rail Road ("LIRR"r the "defendant"), after he allegedly fell while exiting a train at the station located in Inwood, New York (the "Inwood Station"), resulting in a fracture of a bone in his leg. Katzowitz, who states that he was "blinded" in an unrelated car accident several years ago, seeks $5 million in damages based on two claims: (1) a New York common law negligence claim; and (2) a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12142. His wife, Janice Katzowitz, asserts a New York common law loss of consortium claim.

At issue is the LIRR's motion for partial summary judgment dismissing the ADA claim.

## I. BACKGROUND

The following facts are not in dispute, except where indicated otherwise.

Katzowitz alleges that in August 1993, he was in an unrelated car accident, which left him visually impaired. He settled the personal injury case stemming from the accident for the sum of $650,000.00. At his deposition, Katzowitz described his condition as follows: "[the left eye] is not usable ... [and the] right eye has numerous areas in it that do not register visually, thereby, making it a little harder to see. It's as if there were holes in the vision." Based on his visual impairment, Katzowitz applied for Social Security disability benefits in October 1995, and began receiving benefits in November 1996.

Katzowitz has never sought any type of rehabilitation program for his visual impairment. He testified that he does not utilize a cane or seeing eye dog, and is able to walk around in public without assistance—albeit with "extreme caution because I have a problem with distance." Despite this impairment, prior to his fall in this case, he was able to regularly ride a bicycle, go running, and perform household chores involving climbing ladders and electrical work.

In August 1995, Katzowitz was employed as a stockbroker in training in Manhattan. He worked five days a week, from approximately 8:00 a.m. to 8:00 p.m. He generally got to work by walking the 10 blocks from his home to the Inwood Station, and taking the LIRR train to either Brooklyn or Manhattan. To return home, he did the same in reverse. On August 3, 1995, the date of the incident, Katzowitz was a passenger on a LIRR train along his regular route. He boarded the 9:09 p.m. train headed for the Inwood Station. The plaintiff admits that when he boarded the train, he did not tell anyone about his visual impairment. Katzowitz further admits that the LIRR was not on notice that he suffered from any form of visual impairment.

According to the plaintiff, while he was getting off at the train at Inwood Station, his right foot slipped into a gap—alleged to be 9 ½ inches wide—between the train and station platform. He cut his hand during the accident. A conductor helped him get up after the fall. The plaintiff walked home a few minutes later, "in great

pain and difficulty," but without any assistance.

That night, he treated his injury with ice packs and over-the-counter pain relievers. He did not seek medical treatment that evening. The following day, the plaintiff went to work as usual, although he traveled "very slowly."

Katzowitz did not seek medical treatment until two weeks later, on August 16, 1995, at South Nassau Communities Hospital. At that time, the plaintiff was diagnosed with a broken ankle, and was put in a splint, or temporary cast. Prior to this treatment, the plaintiff had not missed a single day of work due to the injury.

The plaintiff testified as follows regarding the lasting injuries he sustained as a result of his fall: "on rainy days my foot hurts me .... [and] my biggest fear since this accident occurs when there's ice and snow on the ground, because I feel that if my foot should bend, it will break because of the previous break and I would be further incapacitated."

## II. DISCUSSION

### (A) Summary Judgment: The Standard

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Wilkinson v. Russell*, 182 F.3d 89, 96 (2d Cir.1999); *Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 453 (2d Cir.1999); *In re Blackwood Associates, L.P.*, 153 F.3d 61, 67 (2d Cir.1998)(citing Fed.R.Civ.P. 56[c]; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Amato v. City of Saratoga Springs*, 170

F.3d 311, 322 (2d Cir.1999) (citing *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997)); *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir.1998) (citing *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988)).

### (B) The ADA

In 1992, Congress enacted the ADA to address the problem of discrimination against persons with disabilities. The ADA prohibits discrimination in employment (Title I), in public services and public transportation (Title II), in public accommodations (Title III), and in telecommunications (Title IV). Title II, which is the subject of this dispute, provides in Section 12132:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Under section 201 of the ADA, "public entity" means:

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of the State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of title 45).

42 U.S.C. § 12131 (1994).

Under the above criteria, the LIRR is subject to Title II of the ADA because it is a "commuter authority," as that term is defined in 45 U.S.C. § 502(8). *See* 45 U.S.C. § 502(8) (defining commuter authority as a "short haul rail passenger service operated in metropolitan and suburban areas....")

### 1. *Discrimination*

■ To state a claim under the ADA, "a plaintiff is expected to show that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of a disability; and (3) the entity which provides the service, program or activity is a public entity." *Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, *6 (S.D.N.Y. Jan. 26, 1999) (citation omitted). "Public entities are prohibited under the ADA from affording to qualified individuals with disabilities opportunities to participate in or benefit from benefits or services that are not equal to the opportunities afforded to non-disabled individuals." *Id.* (citing 28 C.F.R. § 35.130[b]).

Here, the LIRR concedes that the third prong of an ADA claim is present, namely, that it is a public entity which provides transportation. Although the LIRR does not challenge the first prong—that the plaintiff is a "qualified individual with a disability"—the Court, sua sponte, questions whether this is so.

The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment. 42 U.S.C. § 12102(2); *see also Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Indisputably, blindness is a physical impairment within the meaning of the Act, *see* 29 CFR § 1630.2(h)(1) (1998) (defining "physical impairment" as " [a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: . . . special sense organs"), and seeing is one of Katzowitz's major life activities, *see* § 1630.2(i) (listing seeing as an example of a major life activity). "The question is whether his [Katzowitz's alleged impairment of] vision alone 'substantially limits' [his] seeing." *Albertsons, Inc. v. Kirkingburg,* —— U.S. ——, 119 S.Ct. 2162, 2167–2168, ——

L.Ed.2d —— (1999). In this case, the evidence seemingly establishes that there is no such substantial limitation on Katzowitz's vision, given that he: (1) has never sought any type of rehabilitation program for his alleged visual impairment; (2) does not utilize a cane; (3) does not use a seeing eye dog; (4) is able to walk around in public without assistance; and (5) was able to regularly ride a bicycle, go running, and perform household chores involving climbing ladders and electrical work.

Regardless, the plaintiff's claim fails because, as the LIRR effectively argues, there is no genuine issue of material fact as to the second prong of an ADA claim, specifically, that he was denied the benefits of public transportation service by reason of a disability.

### 2. *Key Stations*

Failure of commuter authorities to make "key stations" "readily accessible to individuals with disabilities, including individuals who use wheelchairs," constitutes discrimination under Section 12132. *See* 42 U.S.C. § 12147(b)(1). Accordingly, Department of Transportation ADA regulations require that LIRR's Key Stations be made accessible to individuals with disabilities. 49 C.F.R. § 37.47(a), (c)(1). With regard to train stations constructed prior to enactment of the ADA, the ADA requires only that designated key stations be made accessible to individuals with disabilities, and not all train stations. *See* 42 U.S.C. § 12147(b).

According to the LIRR's Rule 56.1 Statement, "the Inwood Station is not a key station as that term is defined in the regulations for the Americans with Disabilities Act." Katzowitz does not deny this in his Rule 56.1 Counter–Statement. Instead, he states that "As the defendant's statement lacks specificity, plaintiffs do not have enough information to evaluate the accuracy of defendant's statement." He then offers nothing to indicate that the contrary is true, and does not argue other-

wise in his motion papers. In the Court's view, the plaintiffs' failure to dispute the LIRR's clear assertion that the Inwood Station is not a designated "key station" amounts to a tacit concession. At the very least, the "non-movant's 'speculation, conclusory allegations and mere denials' are insufficient" to create a genuine issue of material fact with respect to the "key station" issue. *See Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.,* 25 F.Supp.2d 154, 160–61 (S.D.N.Y.1998) (quoting *Greenblatt v. Prescription Plan Services Corp.,* 783 F.Supp. 814, 819–20 (S.D.N.Y.1992)).

3. *Secretary of Transportation's Regulations Covering Commuter Railroad Platforms*

The Secretary of Transportation has promulgated regulations governing the requirements for commuter railroad platforms, set forth in 49 C.F.R. § 38.93. The regulations state, in pertinent part, that

§ 38.93 Doorways.

(a) Clear width.

(1) At least one door on each side of the car from which passengers board opening onto station platforms and at least one adjacent doorway into the passenger coach compartment, if provided, shall have a minimum clear opening of 32 inches.

(2) If doorways connecting adjoining cars in a multi-car train are provided, and if such doorway is connected by an aisle with a minimum clear width of 30 inches to one or more spaces where wheelchair or mobility aid users can be accommodated, then such doorway shall have, to the maximum extent practicable in accordance with the regulations issued under the Federal Railroad Safety Act of 1970 (49 C.F.R. parts 229 and 231), a clear opening of 30 inches.

(b) Passageways. A route at least 32 inches wide shall be provided from doors required to be accessible by paragraph (a)(1) of this section to seating locations complying with S38.95(d) of this part. In cars where such doorways require passage through a vestibule, such vestibule shall have a minimum width of 42 inches. (See Fig. 3.)

(c) Signals. If doors to the platform close automatically or from a remote location, auditory and visual warning signals shall be provided to alert passengers or closing doors.

(d) Coordination with boarding platform—

(1) Requirements. *Cars operating in stations with high platforms, or mini-high platforms, shall be coordinated with the boarding platform design such that the horizontal gap between a car at rest and the platform shall be no greater than 3 inches and the height of the car floor shall be within plus or minus ⅝ inch of the platform height.* Vertical alignment may be accomplished by car air suspension, platform lifts or other devices, or any combination.

(2) Exception. New vehicles operating in existing stations may have a floor height within plus or minus 1½ inches of the platform height. *At key stations, the horizontal gap between at least one accessible door of each such vehicle and the platform shall be no greater than 3 inches.*

(3) Exception. *Where platform setbacks do not allow the horizontal gap or vertical alignment specified in paragraph (d)(1) or (d)(2) of this section, car, platform or portable lifts complying with § 38.95(b) of this part, or car or platform ramps or bridge plates, complying with S38.95(c) of this part, shall be provided.*

(4) Exception. Retrofitted vehicles shall be coordinated with the platform in new and key stations such that the horizontal gap shall be no greater than 4 inches and the height of the vehicle floor, under 50% passenger

load, shall be within plus or minus 2 inches of the platform height.

49 C.F.R. § 38.93 (emphasis added).

As the LIRR correctly emphasizes, the regulations require a platform "gap" of three inches or less only at key stations, and not at all stations. Thus, the gap regulation did not apply to the Inwood Station, because it is not a key station. The LIRR also notes that even if the regulations were applicable, they would permit an exception where the structural configuration of the platform does not allow such a narrow gap, and would allow for the provision of ramps or bridge plates instead. The LIRR maintains that it was in complete compliance with these requirements, assuming they applied, in that the railroad car in which the plaintiff was a passenger was equipped with a bridge plate which is generally made available for those in need of them. Significantly, the plaintiffs do not dispute that the train involved in this case was so equipped. Rather, the plaintiffs assert that the LIRR should have announced that there was a several-inch gap at the Inwood Station, and the bridge plates were available for disabled individuals in need of it. This Court finds that such an announcement was not required under the ADA.

Although the plaintiff, as a disabled individual, may have had a right to have a bridge plate provided to him upon request, he did not do so. *See Adiutori v. Sky Harbor Intern. Airport,* 880 F.Supp. 696, 703 (D.Ariz.1995), *affirmed,* 103 F.3d 137 (9th Cir.1996). "The plaintiff simply has not established that there is anything in the [ADA] that provides that [commuter authorities] must guess what special services, or the extent of those services, a handicapped passenger requires." *Adiutori v. Sky Harbor Intern. Airport,* 880 F.Supp. at 703. Moreover, the plaintiff concedes that he did not tell anyone about his visual impairment when he boarded the train, and that the LIRR was not on notice that he suffered from any form of visual impairment. There also was nothing about the plaintiff's appearance which would have alerted LIRR observers that he was in need of assistance: Katzowitz does not utilize a cane, is not accompanied by a seeing eye dog, and is able to walk without assistance. He also was a fairly regular user of the Inwood Station. In view of these facts, the "plaintiff's failure to affirmatively communicate that he wanted or needed assistance in connection with [exiting the train] is sufficient to defeat his [ADA] claim." *Id.*

### III. CONCLUSION

Having reviewed the parties' submissions, and for the reasons set forth above, it is hereby

**ORDERED,** that the motion of the defendant Long Island Rail Road for partial summary judgment dismissing the plaintiffs' Americans With Disabilities Act claim is granted; and it is further

**ORDERED,** that the attorneys and the parties are directed to be present at a pretrial settlement conference to be held on September 9, 1999, at 9:00 a.m.; and it is further

**ORDERED,** that the case is set down for the selection of a jury on the remaining cause of action on September 27, 1999 at 9:00 a.m.

**SO ORDERED.**